2009 Ark. 135

**Ryan WHITESIDE, Appellant,**

v.

**RUSSELLVILLE NEWSPAPERS, INC., Paxton Media Group, LLC, Neal Ronquist, Scott Perkins, & Janie Ginocchio, Appellees.**

No. 08–313.

Supreme Court of Arkansas.

March 12, 2009.

Rehearing Denied April 16, 2009.

H. Clay Moore, attorney-in-charge, Houston; and R. David Lewis, co-counsel, Little Rock, for appellant.

Quattlebaum, Grooms, Tull & Burrow, PLLC, by: John E. Tull, III, Kristine G. Baker, and E.B. Chiles IV, Little Rock, for appellees.

PAUL E. DANIELSON, Justice.

Appellant Ryan Whiteside appeals from the circuit court's order granting summary judgment to appellees Russellville Newspapers, Inc., Paxton Media Group, LLC, Neal Ronquist, Scott Perkins, and Janie Ginocchio (collectively, "the Newspaper") in an action for libel and defamation.[1] He further appeals from the circuit court's order denying his motion for new trial. Whiteside asserts four points on appeal: (1) that the circuit court erred in holding that witness statements in a police report were official public documents; (2) that the circuit court erred in finding that witness statements in a police report were voluntarily and legally released; (3) that the circuit court erred in finding that the Newspaper's publications conveyed a substantially fair and correct account of a police report and a prosecutor's letter; and (4) that the circuit court erred in finding that no material facts were in dispute regarding whether the appellees were entitled to the benefit of the fair-report privilege. We affirm.

In January 2007, Neal Ronquist, publisher of the Newspaper, heard a radio report of an alleged rape and believed the Newspaper should look into the story. At that time, the Russellville Police Department allowed the Pope County media to access its AEGIS computer system through a dedicated terminal at the police department, and it determined what documents and records for which it would allow access through the AEGIS system. On January 10, 2007, the Newspaper obtained copies of a case report filed by one of the officers that had been on duty December 31, 2006. The case report revealed that a nineteen-year-old girl had been allegedly raped at a party at Whiteside's home on December 28, 2006. The details in the case report were based on information obtained from the alleged victim and her cousin. The Newspaper subsequently published articles based on the rape allegation and surrounding events.

On February 5, 2007, Whiteside filed his original complaint against the Newspaper. In it, he asserted a "claim and cause of action for libel and defamation ... to recover actual and exemplary or punitive damages for substantial and irreparable injury ... caused and resulting from Defendants' publishing in the Courier of untruths and falsehoods concerning the integrity and character of the Plaintiff."

Whiteside's claims were premised upon an article published by the Newspaper on January 11, 2007, which stated that the Arkansas State Police were investigating an alleged rape that took place during a party at Whiteside's home. The article stated that the Newspaper had obtained

---

1. According to the complaint in this action, Russellville Newspapers, Inc. publishes the Courier News in Russellville; Janie Ginocchio authored the article; Scott Perkins is the editor of the Courier; Neal Ronquist is the publisher of the Courier; and Paxton Media Group is the owner.

police documents detailing the victim's complaint from the Russellville Police Department's AEGIS computer system. It further stated that, according to the police report, the victim's cousin recounted to police a conversation she had with Chelsea Huckabay, who had attended the party. In that conversation, the article stated, Huckabay said that "Jeffery Simmons allegedly put half a tab of the drug Ecstasy in the victim's glass of water, which she drank." Huckabay said that after hearing the victim crying, she checked on her, and she saw Simmons having sexual intercourse with the victim. She further told the victim's cousin, as reported in the article, that she returned to check on the victim and saw "Whiteside allegedly having sexual contact with the victim" while his friend allegedly watched. The article continued to set forth the events of that night, as allegedly relayed by Huckabay to the victim's cousin to the police. The Newspaper then reported that the victim underwent a rape examination, and the clothes she wore to the party were placed into evidence.

Whiteside's complaint alleged that on January 4, 2007, prior to the article's publication, "the source of the hearsay allegations against Plaintiff reported to the Arkansas State Police that she did not tell the accuser's cousin that she saw anyone giving the accuser drugs, or that she saw Plaintiff having sexual contact with the accuser. She further told the State Police that 'she didn't feel that [the accuser] was being made to do things she did not want to do.'" Accordingly, Whiteside asserted, at the time of publication, no one had accused him of any misconduct based on firsthand information, "a fact that Defendants knew or reasonably should have known." In addition, Whiteside asserted in support of his claims, the Newspaper published a follow-up article on January 14, 2007, which he claimed omitted a state-

ment by the local district attorney that there was no evidence that Whiteside had had sexual contact with the victim, and, further, recounted the majority of allegations made in the article of January 11. While the Newspaper did print a "clarification" on January 18, 2007, which included the statement of the district attorney, Whiteside asserted that the clarification "added salacious allegations not related to criminality."

On August 6, 2007, the Newspaper moved for summary judgment. It asserted that it was entitled to summary judgment for the "following three reasons, any one of which alone provides a sufficient independent basis for" summary judgment in its favor:

(a) Plaintiff Ryan Whiteside ("Whiteside") cannot prove the falsity of any of the statements in the articles which form the basis for Whiteside's libel action;

(b) The three articles which form the basis for Whiteside's complaint are protected under the fair-report privilege, and there is no evidence that the fair-report privilege has been lost; and

(c) Whiteside is a limited-purpose public figure who cannot prove actual malice.

On November 16, 2007, the circuit court held a hearing on the Newspaper's motion for summary judgment, and on November 19, 2007, the circuit court issued its order granting the motion and dismissing Whiteside's complaint with prejudice. Whiteside then filed a motion for new trial and relief from judgment on November 30, 2007, which the circuit court denied by an order issued on December 3, 2007. It is from those two orders that Whiteside appeals.

Whiteside first submitted a brief without a proper addendum in violation of Arkansas Supreme Court Rule 4–2(a)(8) (2008),

and on December 11, 2008, this court ordered him to file a substituted abstract, addendum, and brief in compliance with our rules. *See Whiteside v. Russellville Newspapers, Inc.*, 375 Ark. 245, 289 S.W.3d 461 (2008). He has done so, and his appeal is now properly before this court.

■ Whiteside first argues that the witness statements that were released with the case report on the AEGIS computer system should not have been considered part of the official document subject to the fair-report privilege and, therefore, that the circuit court erred in granting summary judgment in favor of the Newspaper. The Newspaper avers that all the information obtained from the AEGIS system, including the portions of the case report that recount witness statements and the portions that detail the initial steps taken by the police officer on duty to investigate the allegations, constitutes official documents that led to an investigation by the Arkansas State Police and is covered by the fair-report privilege.

This court's standard of review for summary judgment is well settled:

> Summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated and the moving party is entitled to judgment as a matter of law. Once a moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. After reviewing undisputed facts, summary judgment should be denied if, under the evidence, reasonable minds might reach different conclusions from those undisputed facts. On appeal, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material question of fact unanswered. This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. Our review is not limited to the pleadings, as we also focus on the affidavits and other documents filed by the parties.

*Sykes v. Williams*, 373 Ark. 236, 239–40, 283 S.W.3d 209, 213 (2008) (internal citations omitted).

It is clear from the record that the circuit court based its order granting summary judgment in favor of the Newspaper on the fair-report privilege. Our court has previously recognized this privilege. *See Butler v. Hearst–Argyle Television, Inc.*, 345 Ark. 462, 49 S.W.3d 116 (2001); *KARK–TV v. Simon*, 280 Ark. 228, 656 S.W.2d 702 (1983). The fair-report privilege is defined in the Restatement (Second) of Torts § 611 (1977), captioned "Report of Official Proceeding or Public Meeting." Section 611 provides that:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.

The first issue, therefore, is whether or not the information regarding the rape allegations in the underlying case that was obtained from the AEGIS system was a report "of an official action or proceeding." This is an issue of first impression in Arkansas; however, the comments to section 611 provide us with some guidance.

The comment on official proceedings explains:

The privilege covered in this Section extends to the report of any official proceeding, or *any action taken by any officer or agency of the government of the United States, or of any State or of any of its subdivisions.* Since the holding of an official hearing or meeting is in itself an official proceeding, the privilege includes the report of any official hearing or meeting, even though no other action is taken. *The filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege.*

Restatement (Second) of Torts § 611 cmt. d (1977) (emphasis added). While Whiteside relies on comment h to section 611, that comment specifically deals with an arrest situation. The witness statements Whiteside complains of in the instant case were not part of an arrest. Here, the statements made were not only attached to the blotter as part of the official police report, but were included in the report itself in the officer's narrative.

Case law from various jurisdictions supports the principle that, generally, information released by the police, including reports and records, is considered to be a report of an official action subject to the fair-report privilege. *See Yohe v. Nugent,* 321 F.3d 35 (1st Cir.2003) (statements made to the press by the police chief based on witness statements); |₈*Kenney v. Scripps Howard Broad. Co.,* 259 F.3d 922 (8th Cir.2001) (information obtained from a missing-person report, a pick-up order, and an investigative report); *Porter v. Guam Publ'n, Inc.,* 643 F.2d 615 (9th Cir. 1981), *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981) (a police investigation obtained from a "daily police bulletin" of criminal complaints and arrest reports, even when based on false charges made by the complainant); *Northland Wheels Roller Skating Ctr. Inc. v. Detroit Free Press, Inc.,* 213 Mich.App. 317, 539 N.W.2d 774 (1995) (information obtained from the police department's written reports or records generally available to the public); *Erickson v. Pulitzer Publ'g Co.,* 797 S.W.2d 853 (Mo.Ct.App.1990) (information obtained from incident reports of the police department); *Biermann v. Pulitzer Publ'g Co.,* 627 S.W.2d 87 (Mo.Ct.App. 1981) (information obtained from arrest warrants, bonds, and affidavits of the prosecuting attorney that were taken from police department files); *Thomas v. Tel. Publ'g Co.,* 155 N.H. 314, 929 A.2d 993 (2007) (information obtained from a presentence investigation report); *Goss v. Houston Cmty. Newspapers,* 252 S.W.3d 652 (Tex.Ct.App.2008) (information obtained from a press release). In the instant case, not only was a report filed based on these witness statements, an investigation commenced by both local and state police. For these reasons, we hold that there was an official action and the information released on the AEGIS system was covered by the fair-report privilege.

■ Whiteside next alleges that the witness statements were illegally released and the |₉Newspaper committed theft by retaining the statements and converting them to their pecuniary gain after learning that they did not have voluntary possession of the statements. The Newspaper avers that this argument is made for the first time on appeal and, in addition, that the Newspaper should not be faulted for obtaining the report on the AEGIS system when it was placed there by an employee of the police department devoid of any restrictions. Furthermore, the Newspaper contends that there is no evidence that anyone asked it to return the information or refrain from publishing it.

We agree that Whiteside argues for the first time on appeal that the Newspaper

committed theft. Whiteside's counsel in fact stated to the court at the hearing, "[w]ell, they really didn't steal anything," before continuing on to analogize the situation to someone finding another person's billfold on the sidewalk with a thousand dollars in it. This court has repeatedly held that we will not address an argument raised for the first time on appeal. *See Sykes v. Williams,* 373 Ark. 236, 283 S.W.3d 209 (2008).

■ Further, we find no merit in Whiteside's argument that the circuit court erred by finding that the report was voluntarily and legally released. The evidence presented by Whiteside illustrates, at best, that the release was inadvertent.

In reviewing the record, it is undisputed that the Russellville Police Department used the AEGIS computer system to manage its records and, at the time of the instant case, allowed the Newspaper to access the blotter. Normally, the blotter contained everything from a case report but the narrative portion. The officer that filed the report included a narrative portion that Lieutenant Charles Falwell of the Russellville Police Department admitted should not have been part of the blotter; however, it was released on the AEGIS system in the case report. Scott Perkins, editor of the Newspaper, testified that he called Falwell inquiring about an alleged rape and its report but was told that there would not be much in the report. When Perkins accessed the report, he got a more detailed incident report than he expected and called Falwell again. Perkins testified that Falwell simply said he was locked out of the report and that Perkins must have a good reporter. Falwell admitted that he did not tell Perkins there were any restrictions on the release of the information in that case report or that the report should not have been released. There is no evidence in the record that suggests the Newspaper obtained this information dishonestly. On the contrary, the evidence shows the Newspaper obtained the information through the AEGIS system, a system that the police specifically permitted the Newspaper to access. While the release of a specific portion of the report may have been a mistake made by the police, it was not the result of any wrongdoing by the Newspaper.

Whiteside argues that the Newspaper should have known that the witness statements were not supposed to be part of the blotter. However, there is nothing to suggest that the privilege is lost because the Newspaper failed to investigate whether or not it was supposed to have access to that portion of the report. In fact, the United States Supreme Court has held that the First Amendment protects against the "timidity and self-censorship" that may result from such an approach. *See The Florida Star v. B.J.F.,* 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (citing *Cox Broad. Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975)). The Court in *The Florida Star* stated:

> [D]epriving protection to those who rely on the government's implied representations of the lawfulness of dissemination, would force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication. This situation could inhere even where the newspaper's sole object was to reproduce, with no substantial change, the government's rendition of the event in question.

*Id.* at 536, 109 S.Ct. 2603.

It seems clear that an inadvertent release of information is not analogous to an involuntary release or an illegal gain of information. As discussed, the record is devoid of any evidence of any wrongdoing on the part of the Newspaper in obtaining

the information. It was not incumbent upon the Newspaper to determine what information could or could not be published after its release by the police. Therefore, we affirm the circuit court's finding that the information was lawfully and legally obtained.

■ For his final point on appeal, Whiteside argues that if the privilege applied in this case, it was lost because the articles were not a fair and accurate report. The Newspaper avers that the articles were substantially accurate reports of information taken from official documents and that it conveyed the required gist or sting of that information.

This court has previously discussed the privilege granted by section 611 and the loss of that privilege should the publisher not give a fair and accurate report:

According to the comments to section 611, the basis of the privilege is the "interest of the public in having information made available to it as to what occurs in official proceedings and public meetings." [*Restatement (Second) of Torts* § 611 (1977) ], cmt. a. Significantly, the privilege exists "even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false. Abuse of the privilege takes place, therefore, when the publisher does not give a fair and accurate report of the proceeding." *Id.*

With regard to the accuracy and fairness of the report, it is enough that it conveys a substantially correct account of the proceedings. *Id.*, cmt. f. Furthermore, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression. *Id.* The privilege does not apply where a person testifies in a proceeding solely

for the purpose of obtaining the fair-report shield for himself or in collusion with a third party. *Id.*, cmt. c.

*Butler v. Hearst–Argyle Television, Inc.*, 345 Ark. 462, 468, 49 S.W.3d 116, 119–20 (2001).

In addition to considering the comments provided in section 611, this court has applied the substantial-truth doctrine in testing the accuracy of a report. *See KARK–TV v. Simon*, 280 Ark. 228, 229, 656 S.W.2d 702, 703 (1983). The literal truth is not necessary, the substantial truth will suffice, and, as long as the gist or the sting of the publication is in essence true, some minor conflicts in what was alleged will not eliminate the privilege. *See id.* (citing *Pritchard v. Times Sw. Broad., Inc.*, 277 Ark. 458, 642 S.W.2d 877 (1982)).

Whiteside alleges that there were several statements included in the articles that made them unfair and inaccurate. One sentence in the January 11, 2007 article reads: "The Courier obtained police documents from the Russellville Police Department's AEGIS computer system detailing the victim's complaint." Whiteside argues that statement is false because the victim did not make a detailed complaint of criminal conduct. We do not agree. While the report was made by both the victim and her cousin, the report clearly lists the victim's name as the victim, and details were placed in the report by both of the women.

Additionally, Whiteside argues that "the article is replete with juxtaposition of 'police report' and 'cousin's statement,' reasonably leading the reader to conclude that the police report represented an official action following investigation of the cousin's statement." Again, we do not agree. Before several of the cousin's statements were revealed in the article, the article specifically reads: "In a separate state-

ment given to police, the victim's cousin recounted a Dec. 31 conversation she had with Chelsea Huckabay, who was at the party, about what allegedly happened." The next few paragraphs discuss the details of what, according to the victim's cousin, Chelsea Huckabay had witnessed. While a few sentences attributed the information to the report rather than the cousin's statement, it is clear when looking at those paragraphs as a whole, that the information had been gathered from the report, as recounted to the police by the victim's cousin. This court cannot hold that the article was not an accurate and complete or a fair abridgment of the occurrence reported. Although the information came from the victim's cousin, all but one of the details published was recorded in the actual police report.[2] Therefore, while the juxtaposition of "police report" and "cousin's statement" might have been a bit confusing, we cannot hold it was enough to eliminate the privilege.

The Newspaper published a follow-up article on January 14, 2007, based upon statements made by David Gibbons, the prosecuting attorney, and a letter that Gibbons wrote on January 12, 2007, to Stacie Rhoads, a special police agent. The article revealed that no charges were filed in the case because, as the letter stated, "the [Arkansas State Police]'s interview with Huckabay 'produced a scenario diametrically opposed' to what was alleged in the initial police report," and because, as Gibbons explained, "there was a lack of evidence for prosecution." Also provided in the article was the background of the case

from the initial police report and additional details gathered from the Arkansas State Police investigation. The article further revealed that Huckabay's story was very different from what the alleged victim's cousin told the police and that Simmons had admitted to consensual sex. A part of Rhoads's report was published which declared "it was apparent that [the accuser] had some knowledge of the events and even joked with the encounters [sic]." Two of the alleged victim's text messages that she sent to Simmons after the alleged incident were also published, and the article explained that there were seven more.

Whiteside contends that the follow-up article was not protected by the fair-reporting privilege because it did not include the sentence from Gibbons's letter that "totally exonerated" Whiteside, and there was "no good reason why such sentence was not included in the Follow-up." First, this argument is irrelevant because Whiteside is not claiming he was defamed by the new information included in the follow-up article; therefore, the Newspaper has no reason to invoke that privilege. While the follow-up article did repeat information from the first article, because we hold that the privilege applies to the fair and accurate report of that information, the second publication of the same information is of no significance. Furthermore, Whiteside does not cite any authority or provide a meritorious argument as to why the omission of a single sentence is equivalent to the failure of the Newspaper to report the "gist" or the "sting" of the situation. It is

---

**2.** The Newspaper admitted that the sentence stating "When Huckabay approached the bedroom a third time, she allegedly found the door locked, and according to the police report, text-messaged Jones, who was in the bedroom with the victim, Whiteside and Simmons," was actually not included in the police report. However, Whiteside admits that the accusation was part of the cousin's state-

ment and does not challenge that as a false fact. On the contrary, Whiteside admitted that he locked his bedroom door, and that he and Jones stayed in the room while Simmons had sexual intercourse with the victim. In addition, the very next sentence in the article regarding an alleged text-message response from Jones clarifies that it was according to the cousin's statement.

elementary that this court will not consider an argument if the appellant does not make a convincing argument or cites no authority to support it. *See Maulding v. Price's Util. Contractors, Inc.,* 375 Ark. 547, 294 S.W.3d 413 (2009).

Finally, Whiteside argues that the privilege should not apply to the articles because of malice and excessive publication on the part of the Newspaper. However, it is clear that those issues are not part of the analysis under the fair-report privilege. This court has $\lfloor_{16}$determined that the privilege is only lost by a failure to ensure that the report is accurate and complete or a fair abridgment. *See Butler,* 345 Ark. at 469, 49 S.W.3d at 121. We hold that the Newspaper fairly and accurately reported the information as released by the police on the AEGIS system.

For these reasons, we affirm the circuit court's order granting summary judgment in favor of the Newspaper, and we affirm the circuit court's order denying Whiteside's motion for a new trial.

Affirmed.